IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 25-cv-02950-PAB-NRN

ASHLEY SALAMO, and
KRISTINA SALAMO,

Plaintiffs,

v.

U.S. CITIZENSHIP AND IMMIGRATION SERVICES,
JOSEPH B. EDLOW, Director,
U.S. DEPARTMENT OF HOMELAND SECURITY,
MARKWAYNE MULLIN,[1] Director,
USCIS DENVER FIELD OFFICE,
ANDREW LAMBRECHT, Field Officer Director, and
USCIS ADMINISTRATIVE APPEALS OFFICE,

Defendants.

---

**ORDER**

---

This matter comes before the Court on the Motion to Dismiss [Docket No. 19]. Plaintiffs filed a response, Docket No. 25, and defendants filed a reply. Docket No. 27.

## I. BACKGROUND[2]

Plaintiff Ashley Salamo was born in 1988 in Frankfurt am Main, Germany. Docket No. 1 at 5, ¶ 23. Her younger sister, plaintiff Kristina Salamo, was born in 1990 in Frankfurt am Main, Germany. *Id.* At the time of their birth, plaintiffs' father, Mualia Salamo, was serving in the United States Army and was based in Frankfurt am Main,

[1] Pursuant to Federal Rule of Civil Procedure 25(d), Markwayne Mullin is automatically substituted as a party in this action.

[2] The facts below are taken from plaintiffs' complaint, Docket No. 1, and are presumed to be true, unless otherwise noted, for purposes of ruling on defendants' motion to dismiss.

Germany. *Id.* Mr. Salamo served in the United States Army from 1987 to 2006, earning many distinctions and awards. *Id.*, ¶ 24. Mr. Salamo suffered a traumatic brain injury during his service. *Id.*

In 1991, Mr. Salamo was reassigned to Fort Carson in Colorado Springs and moved his family to Colorado. *Id.* at 6, ¶ 25. Plaintiffs were one and three years old at the time and have resided in Colorado ever since. *Id.* at 3, 6, ¶¶ 12, 25. When plaintiffs entered the United States, they had the status of United States nationals and had United States passports.[3] *Id.* at 6, ¶ 26. This status was acquired through Mr. Salamo's representation that he was born in American Samoa and thus was a United States national.[4] *Id.* On December 21, 1995, plaintiffs' mother, Kapenata Salamo, became a naturalized United States citizen. *Id.*, ¶ 27. Mr. Salamo naturalized as a United States citizen on January 4, 1996. *Id.* It was later discovered that Mr. Salamo lied about his place of birth; he was born in Samoa, not American Samoa.[5] *Id.*, ¶ 28. Nevertheless, Mr. Salamo was allowed to retain his citizenship because he naturalized under 8 U.S.C. § 1440, which allows noncitizens without lawful status to become a United States citizen based on honorable service in the United States military during certain designated

---

[3] "[T]he legal definitions of U.S. national and U.S. citizen are not synonymous. All citizens of the United States are nationals, but some nationals, such as persons born in American Samoa and other U.S. territorial possessions, are not citizens." *United States v. Karaouni*, 379 F.3d 1139, 1142-43 (9th Cir. 2004) (citations omitted). "[I]nhabitants of American Samoa are entitled under the principles of the Constitution to be protected in life, liberty, and property . . . but they are not possessed of the political rights of citizens of the United States." *Hueter v. Kruse*, 576 F. Supp. 3d 743, 754 (D. Haw. 2021) (citation, internal quotations, and alterations omitted).

[4] United States nationals can pass this status to their children, even if the children were born outside the United States and its outlying possessions. 8 U.S.C. § 1408(4).

[5] Plaintiffs do not allege when it was discovered that Mr. Salamo misrepresented where he was born.

conflicts. *Id.* Plaintiffs, however, lost their United States national status because their father was in fact never a United States national and could not transfer such status to plaintiffs. *Id.* at 7, ¶ 29. In January 2019, the Department of State refused to renew plaintiffs' passports because Mr. Salamo had never been a United States national. *Id.*, ¶ 30. Plaintiffs had previously successfully renewed their United States passports on three occasions. Docket No. 1-2 at 40-46.

On July 13, 2024, plaintiffs filed N-600 applications for Certificates of Citizenship, claiming entitlement to citizenship under former 8 U.S.C. § 1432.[6] Docket No. 1 at 2, 7, ¶¶ 8, 32. United States Citizenship and Immigration Services ("USCIS") denied the N-600 applications on November 27, 2024. *Id.* at 2, ¶ 9. On December 24, 2024, plaintiffs appealed the denials to the Administrative Appeals Office. *Id.* at 3, ¶ 10. The appeals were denied on April 10, 2025. *Id.*, ¶ 11. On September 18, 2025, plaintiffs filed a complaint in this case, bringing one claim under 8 U.S.C. § 1503(a) for a declaration that they are United States citizens pursuant to former 8 U.S.C. § 1432.[7] *Id.* at 7, ¶ 33. On February 2, 2026, defendants filed a motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing that plaintiffs' claim is time-barred and, alternatively, that plaintiffs' claim fails on the merits. Docket No. 19. On February 23, 2026, plaintiffs filed a response, Docket No. 25, and on March 9, 2026, defendants filed a reply. Docket No. 27.

---

[6] "This section was repealed by the Child Citizenship Act of 2000 § 103, Pub.L. 106–395, 114 Stat. 1631, 1632." *Nwozuzu v. Holder*, 726 F.3d 323, 325 n.1 (2d Cir. 2013).

[7] Plaintiffs emphasize that they are not challenging the revocation of their United States national status. Docket No. 1 at 7, ¶ 31.

## II. LEGAL STANDARD

### A. <u>12(b)(1)</u>

Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A dismissal under Rule 12(b)(1) is not a judgment on the merits; rather, it is a determination that the court lacks jurisdiction to adjudicate the claim. *Creek Red Nation, LLC v. Jeffco Midget Football Ass'n., Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016). A court lacking jurisdiction "must dismiss the cause at any stage of the proceedings in which it becomes apparent that jurisdiction is lacking." *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, 945 F.3d 1270, 1273 (10th Cir. 2019) (citation omitted). The dismissal is without prejudice. *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1218 (10th Cir. 2006).

Challenges to subject matter jurisdiction may take two forms – a facial attack or a factual attack – each with distinct analytical frameworks. *United States v. Rodriguez-Aguirre*, 264 F.3d 1195, 1203 (10th Cir. 2001). A facial challenge focuses on the sufficiency of the allegations in the complaint. *Id.* In resolving a facial challenge, "the district court must accept the allegations in the complaint as true." *Id.* By contrast, a factual challenge allows a party to "go beyond allegations contained in the complaint and challenge the facts upon which subject matter jurisdiction depends." *Id.* (citation omitted). In addressing a factual challenge to subject matter jurisdiction, "the court does not presume the truthfulness of the complaint's factual allegations." *Id.* (citation and quotations omitted); *see also Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1225 (10th Cir. 2001) ("a court's reference to evidence outside the pleadings does not convert the motion into a Rule 56 motion").

"[S]tatutes of limitations are not ordinarily jurisdictional." *Lopez-Munoz v. Barr*, 941 F.3d 1013, 1017 (10th Cir. 2019) (citing *Musacchio v. United States*, 577 U.S. 237, 246 (2016)). "Federal statutes of limitations . . . are jurisdictional 'only if Congress has clearly stated as much.'" *Eyring v. Fondaco*, 667 F. App'x 983, 984 (10th Cir. 2016) (unpublished) (quoting *United States v. Wong*, 575 U.S. 402, 409 (2015)). If a statute of limitations is nonjurisdictional, it is properly challenged under Rule 12(b)(6), not Rule 12(b)(1). *Alexander v. Foegen*, No. 10-cv-01993-LTB-MEH, 2011 WL 1655548, at *2 (D. Colo. Mar. 21, 2011), *report and recommendation adopted*, 2011 WL 1541282 (D. Colo. Apr. 25, 2011) (citing *Day v. McDonough* 547 U.S. 198, 205 (2006)). Unlike a jurisdictional statute of limitations, "a nonjurisdictional time limit can be equitably tolled, even when it governs litigation against the United States." *Farhat v. United States*, 2022 WL 2840483, at *4 (10th Cir. July 21, 2022).

**B. <u>12(b)(6)</u>**

To survive a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure, a complaint must allege enough factual matter that, taken as true, makes the plaintiff's "claim to relief . . . plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190 (10th Cir. 2012) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The 'plausibility' standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible." *RE/MAX, LLC v. Quicken Loans Inc.*, 295 F. Supp. 3d 1163, 1168 (D. Colo. 2018) (citing *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008)). Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Twombly*, 550 U.S. at 555) (alterations omitted). A court, however, does not need to

accept conclusory allegations. *See, e.g.*, *Hackford v. Babbit*, 14 F.3d 1457, 1465 (10th Cir. 1994) ("we are not bound by conclusory allegations, unwarranted inferences, or legal conclusions").

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not shown – that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (quotations and alterations omitted); *see also Khalik*, 671 F.3d at 1190 ("A plaintiff must nudge [his] claims across the line from conceivable to plausible in order to survive a motion to dismiss." (quoting *Twombly*, 550 U.S. at 570)). If a complaint's allegations are "so general that they encompass a wide swath of conduct, much of it innocent," then plaintiff has not stated a plausible claim. *Khalik*, 671 F.3d at 1191 (quotations omitted). Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." *Bryson*, 534 F.3d at 1286 (alterations omitted).

## III. ANALYSIS

Plaintiffs bring suit under 8 U.S.C. § 1503(a). Docket No. 1 at 4-5, ¶ 20. Section 1503(a) states, in relevant part,

> If any person who is within the United States claims a right or privilege as a national of the United States[8] and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of Title 28 against the head of such department or independent agency for a judgment

[8] In the context of 8 U.S.C. § 1503(a), the term "national of the United States" refers to United States citizens and non-citizen nationals born in American Samoa or Swains Island. *Ching-Yuan Tseng v. Biden*, 2021 WL 1784940, at *3 n.2 (D.D.C. May 5, 2021).

> declaring him to be a national of the United States. . . . An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege.

8 U.S.C. § 1503(a) (footnote added). Defendants' first argument is that plaintiffs' claim is time-barred under the five-year statute of limitations. Docket No. 19 at 3.

### A. Statute of Limitations

As an initial matter, defendants appear to bring their statute of limitations argument under Rule 12(b)(6). While the motion to dismiss asserts that it is brought under Rules 12(b)(1) and 12(b)(6), Docket No. 19 at 1, defendants state that a statute of limitations defense is properly raised under Rule 12(b)(6). *Id.* at 3. Defendants argue that the Court does not have jurisdiction over any claim brought under the Administrative Procedure Act ("APA"), *id.* at 14, but do not argue that § 1503(a)'s statute of limitations strips the Court of jurisdiction. Thus, the Court understands defendants as bringing their APA argument under Rule 12(b)(1) and their statute of limitations argument under Rule 12(b)(6). This accords with a recent Fifth Circuit case which determined that § 1503(a)'s statute of limitations is nonjurisdictional. *Villegas v. Noem*, 149 F.4th 554, 568 (5th Cir. 2025). Because no party argues that the statute of limitations is jurisdictional and because precedent supports that it is nonjurisdictional (albeit nonbinding precedent), the Court assumes for the sake of this order that § 1503(a)'s statute of limitations is nonjurisdictional.

Section 1503(a) is silent on whether the statute of limitations commences after the first final administrative denial or most recent final administrative denial. *Gonzalez v. Limon*, 926 F.3d 186, 188 (5th Cir. 2019). However, courts have held that the statute of limitations is triggered by "the first act of denial of a right or privilege based on a claim

of United States nationality."[9] *Heuer v. U.S. Sec'y of State*, 20 F.3d 424, 428 (11th Cir. 1994); *see also Gonzalez*, 926 F.3d at 189-90; *Henry v. Quarantillo*, 684 F. Supp. 2d 298, 307 (E.D.N.Y. 2010). Defendants argue that the statute of limitations under § 1503(a) commenced when the Department of State refused to renew plaintiffs' passports in January 2019. Docket No. 19 at 4-5. Plaintiffs, on the other hand, argue that the statute of limitations for this action commenced on April 10, 2025, following the resolution of the appeal of USCIS's denial of plaintiffs' N-600 applications. Docket No. 25 at 2.

"[A] denial of a passport application has been held to constitute a 'final administrative denial' for purposes of determining whether a claim is time-barred under section 1503(a)." *Icaza v. Shultz*, 656 F. Supp. 819, 822 (D.D.C. 1987) (citing *Whitehead v. Haig*, 794 F.2d 115, 119 (3d Cir. 1986). This makes sense because "regulations require a passport applicant to prove U.S. citizenship and to provide documentary evidence of such citizenship." *Garza v. Clinton*, 2010 WL 5464263, at *6 (S.D. Tex. Dec. 29, 2010) (citing 22 C.F.R. §§ 51.40, 51.41); *see also Alsaidi v. United States Dep't of State*, 292 F. Supp. 3d 320, 327 (D.D.C. 2018) ("everyone who applies for a passport is required to present proof of identity and citizenship.") (citations omitted). Therefore, in order to deny a passport application, the Department of State must consider evidence and determine whether the applicant is a national of the United States. Conversely, the Eleventh Circuit has noted that, according to the testimony of a Special Agent with the Department of State, while passport renewal applications

[9] The parties cite no Tenth Circuit caselaw addressing § 1503(a)'s statute of limitations, nor is the Court aware of any.

similarly require proof of citizenship, that proof is satisfied by the submission of a prior passport. *United States v. Schreck*, 130 F.4th 1297, 1300 (11th Cir. 2025). Therefore, because proof of citizenship is typically satisfied by submission of a prior passport, renewing a passport application does not typically require the Department of State to analyze detailed evidence to determine whether the renewal applicant is a national of the United States. Thus, it is unclear that denying a renewal application would constitute a final agency action under § 1503(a). But here, plaintiffs have not alleged the details of their renewal applications besides stating that they were denied due to their father not being born in American Samoa. Docket No. 1 at 7, ¶ 29. Therefore, the Court cannot determine whether plaintiffs submitted detailed evidence in support of their renewal application or if they solely submitted their prior passport. And at least one trial court has held that denial of an application to renew a passport represents a final administrative denial under § 1503(a). *See Sanchez v. Rubio*, 2025 WL 289229, at *3 (S.D. Tex. Jan. 23, 2025).

Even if the denial of an application to renew a passport represents a final administrative denial under § 1503(a), the Court still finds that plaintiffs' claims are not time-barred. Courts have recognized that allowing a cause of action under § 1503(a) to accrue after any final administrative denial "would allow an individual indefinitely to prolong the period by continuing to file applications," thus making the "limitations period established by Congress in section 1503(a) . . . empty of meaning." *Gonzalez*, 926 F.3d at 189 (internal quotations, citations, and alterations omitted). "The concern in this line of cases is the want of finality attending tolerance of repetitious challenges following duplicative denials." *Id.* However, courts have found that, when allowing a plaintiff to

proceed in a § 1503(a) action would "agree with Congress' desire for finality" and when a new claim to citizenship is "qualitative[ly] different" than a previous claim, then the statute of limitations commences from the final administrative denial of the new claim. *Mendoza v. Dep't of Homeland Sec.*, 2022 WL 1744649, at *4 (D.N.J. May 27, 2022); *cf. Arthur-Price v. Blinken*, 2022 WL 1004415, at *3 (N.D. Ill. Apr. 4, 2022) (finding that the five-year statute of limitations reset upon denial of a passport application that "differed materially" from a previous passport application); *Alvarez v. United States Dep't of State*, 2025 WL 2370827, at *3 (C.D. Cal. June 25, 2025) (same).

The Court finds that adjudicating plaintiffs' claim for citizenship based on the denial of their N-600 applications would not undermine Congress's desire for finality. The Department of State refused to renew plaintiffs' passports in January 2019 because it was discovered that Mr. Salamo was never a United States national and therefore did not pass United States national status to plaintiffs. Docket No. 1 at 7, ¶ 30. Plaintiffs' current claim is not based on this administrative action; it is based on the denial of plaintiffs' N-600 applications. *Id.*, ¶ 31. Plaintiffs' N-600 applications do not assert that they are entitled to United States national status. Rather, the N-600 applications assert that plaintiffs automatically acquired United States citizenship pursuant to former 8 U.S.C. § 1432 when their parents naturalized while they were minors. *Id.* This is a different claim, asserting entitlement to a different right under a different statute due to a different set of facts. Plaintiffs have never claimed entitlement to citizenship under § 1432. Thus, adjudicating such a claim for the first time does not interfere with the desire for finality underscoring § 1503(a)'s statute of limitations. It is not a "repetitious

challenge" based on a "duplicative denial," *Gonzalez*, 926 F.3d at 189, but is a new challenge based on the first denial of plaintiffs' § 1432 claim.

Courts have not elaborated on what makes a new claim to citizenship "qualitatively different" than a prior claim. However, courts discuss qualitatively different claims as being based on new evidence that is substantial enough to possibly change the outcome of the claim. *See Gonzalez*, 926 F.3d at 189; *Mendoza*, 2022 WL 1744649, at *4. Plaintiffs' case here is even stronger. Plaintiffs did not submit new evidence in an attempt to show they are entitled to United States national status based on their father's birthplace—the reason why their passport renewal applications were denied. Instead, as discussed above, plaintiffs based their N-600 applications on a different claim to citizenship based on a different statute altogether. Thus, plaintiffs' N-600 applications are distinct from plaintiffs' passport renewal applications.

Accordingly, the Court finds that the statute of limitations for this action commences from the April 10, 2025 denial of plaintiffs' N-600 application appeals, not from the Department of State's January 2019 refusal to renew plaintiffs' passports. Plaintiffs filed this action on September 18, 2025, just over five months after the final administrative action, and well within § 1503(a)'s five-year statute of limitations. Thus, the Court finds that plaintiffs' § 1503(a) claim is not time-barred.

### B. <u>Interpretation of Former 8 U.S.C. § 1432(a)</u>

Defendants argue that, even if plaintiffs' claim is not time-barred, plaintiffs are still not entitled to citizenship. Docket No. 19 at 6-10. In determining whether plaintiffs derived citizenship after their parents naturalized, "[t]he law applicable is that in effect at the time the critical events giving rise to the claim for derivative citizenship occurred." *Morgan v. Att'y Gen. of U.S.*, 432 F.3d 226, 230 (3d Cir. 2005) (citation omitted). "The

relevant times are the date of the child's birth, the time of the child's entry into the United States, and the date of the parent's naturalization." *Id.* (citation omitted). Here, all parties agree that former 8 U.S.C. § 1432(a) was in effect during this time period and governs plaintiffs' claim to citizenship.[10] Docket No. 19 at 6; Docket No. 25 at 3.

In relevant part, § 1432(a) provided that "a 'child born outside of the United States to alien parents' automatically became a citizen of the United States upon the fulfillment of the following conditions: (1) the naturalization of both parents . . . and if (4) Such naturalization takes place while such child is unmarried and under the age of eighteen; and (5) Such child is residing in the United States pursuant to lawful admission for permanent residence at the time of the naturalization of the parent . . . , or thereafter begins to reside permanently in the United States while under the age of eighteen years." *United States v. Forey-Quintero*, 626 F.3d 1323, 1326 (11th Cir. 2010) (quoting 8 U.S.C. § 1432(a)). Defendants do not dispute that both of plaintiffs' parents naturalized before their eighteenth birthday. Docket No. 19 at 7. Moreover, plaintiffs do not argue that they acquired lawful admission for permanent residence before their parents' naturalization. *See generally* Docket No. 25. Thus, the relevant inquiry is whether, under § 1432(a)(5), plaintiffs began "to reside permanently in the United States while under the age of eighteen years" following their parents' naturalization.

Defendants interpret both clauses of § 1432(a)(5) as requiring that the child be a lawful permanent resident in order to derive citizenship. Docket No. 19 at 8. Specifically, defendants assert that

---

[10] Former 8 U.S.C. § 1432 was in effect from 1952 until it was repealed in 2000. *Cheneau v. Garland*, 997 F.3d 916, 924 (9th Cir. 2021).

> The first clause—a "child . . . residing in the United States pursuant to a lawful admission for permanent residence at the time of the naturalization of" their parents—applies to children who are lawful permanent residents "at the time" their parent naturalizes. The second clause—a "child . . . who thereafter begins to reside permanently in the United States"—applies to children who become lawful permanent residents after their parent naturalizes. In other words, a plain reading of Section 1432(a)(5) establishes the requirement that a child be residing pursuant to lawful admission ***either*** at the time of their parents' naturalization ***or*** at a subsequent time before the age of 18.

*Id.* Plaintiffs, on the other hand, argue that the second clause of § 1432(a)(5) does not require lawful permanent resident status. Docket No. 25 at 3-6.

There is a circuit split regarding how § 1432(a)(5) should be interpreted.[11] In *United States v. Forey-Quintero*, 626 F.3d 1323, 1326-28 (11th Cir. 2010), the Eleventh Circuit interpreted the phrase "begins to reside permanently in the United States while under the age of eighteen years" to "require[ ] the child to acquire the status of an alien lawfully admitted for permanent residence before turning eighteen." In doing so, the Eleventh Circuit reasoned that "the phrase reside permanently includes an implied requirement that the residence be lawful." *Id.* at 1327 (internal quotations and citations omitted). Additionally, the Eleventh Circuit found that "requiring anything less than the status of lawful permanent resident would essentially render the first clause of subsection 5 'mere surplusage.'" *Id.* In reaching this conclusion, the Eleventh Circuit relied on the Board of Immigration Appeal's ("BIA's") analysis in *Matter of Nwozuzu*, 24

[11] Defendants indicate that a Third Circuit case, *Morgan*, 432 F.3d at 230, supports their interpretation of § 1432(a)(5). However, *Morgan* does not analyze the proper interpretation of § 1432(a)(5). Rather, it interprets a different portion of § 1432 dealing with naturalization under the statute when the child's parents are legally separated, which is irrelevant to the instant case. *Id.* at 230-34. Thus, the Court does not find that *Morgan* supports defendants' interpretation of the statute.

I. & N. Dec. 609, 614 (BIA 2008).[12] *Id.* There, the BIA noted that, if the second clause of § 1432(a)(5) did not require lawful permanent residence, the first clause would be "effectively negate[d]," reasoning that "[a]n alien would rarely if ever need to be 'residing in the United States pursuant to a lawful admission for permanent residence' because he or she could simply show that some lesser form of residence was 'thereafter' acquired before the alien reached the age of 18." *Matter of Nwozuzu*, 24 I. & N. Dec. at 614.

The Second Circuit reversed *Matter of Nwozuzu* in *Nwozuzu v. Holder*, 726 F.3d 323 (2d Cir. 2013). In *Nwozuzu*, 726 at 327, the Second Circuit noted that "the two clauses use different words," with the first clause using the term "lawful admission for permanent residence" and the second clause using the term "reside permanently." The court determined that the two phrases "have plainly different meanings." *Id.* Specifically, the court noted that the term lawfully admitted for permanent residence "is a term of art" with a distinct definition in the Immigration and Nationality Act ("INA").[13] *Id.* (citations omitted). By contrast, the court stated that the term reside permanently is not defined in the INA, although the word "permanent" is defined. *Id.* (citation omitted). The Second Circuit also cited two sections of the INA "in which the phrases 'lawfully admitted for permanent residence' and 'reside permanently' are used in a manner to suggest their meanings are distinct." *Id.* at 328 (citing 8 U.S.C. § 1433(a)(5)(A) (1994);

---

[12] The Eleventh Circuit also relied on *Romero-Ruiz v. Mukasey*, 538 F.3d 1057 (9th Cir. 2008), which was later overturned in *Cheneau*, 997 F.3d at 925-26. *Forey-Quintero*, 626 F.3d at 1327.

[13] The INA defines "lawfully admitted for permanent residence" as "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." 8 U.S.C. § 1101(a)(20).

8 U.S.C. § 1438(b)(2) (2012)). The court found that the second clause of § 1432(a)(5) does not require lawful permanent residence, but does require "some objective official manifestation of the child's permanent residence." *Id.* at 333 (quoting *Ashton v. Gonzales*, 431 F.3d 95, 98-99 (2d Cir. 2005)). The court also found that this interpretation was supported by the legislative history of § 1432(a) and through the purpose of the INA. *Id.* at 329-332. Relying in part on the analysis in *Nwozuzu*, the Ninth Circuit overturned a previous opinion interpreting § 1432(a)(5) and also held that the second clause of § 1432(a)(5) does not require lawful permanent residence, but instead requires "some objective official manifestation of the child's permanent residence." *Cheneau*, 997 F.3d at 925.

When interpreting a statute, a court begins with the text. *United States v. Broadway*, 1 F.4th 1206, 1211 (10th Cir. 2021) (citation omitted). As noted in *Nwozuzu*, 726 F.3d at 327, the term "lawful admission for permanent residence" and the term "reside permanently" use different words. "[W]hen the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." *United States v. Martinez*, 518 F.3d 763, 766-67 (10th Cir. 2008) (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712 n.9 (2004)). Given this rule of statutory interpretation, the Court finds it unlikely that Congress intended for "reside permanently" to have the same meaning as "lawful admission for permanent residence." This conclusion is bolstered by the following considerations.

First, as described above, "the terms 'lawful admission for permanent residence' and 'reside permanently' have different meanings in the INA." *Cheneau*, 997 F.3d at 920; *see also Nwozuzu*, 726 F.3d at 327-28; *Thomas v. Lynch*, 828 F.3d 11, 15 (1st Cir.

2016). The Ninth Circuit laid out multiple examples of sections of the INA where the term "reside permanently" appears, "but not as a synonym for 'lawful admission for permanent residence."[14] *Cheneau*, 997 F.3d at 921 (citations omitted). Second, the derivative citizenship status predating § 1432(a) stated that "a child could derive citizenship if she either was 'residing in the United States at the time of the naturalization of the parent,' or 'thereafter beg[an] to reside permanently in the United States while under the age of eighteen.'" *Id.* at 923-24 (citation omitted). With the creation of the INA in 1952, Congress "established lawful permanent residency as a term of art describing a new legal status." *Id.* at 924 (citation omitted). The original version of the INA also included § 1432(a), which modified the former derivative citizenship statute to include one pathway for citizenship which involved acquiring the newly created "lawful permanent residency" status and one pathway that only required a child to "reside permanently in the United States while under the age of eighteen." *Id.* at 923-24. "Congress's ultimate decision to maintain two separate pathways and only add this new term of art to one of them supports the conclusion that Congress did not intend for lawful permanent resident status to be a prerequisite to both pathways."[15] *Id.* at 924. Lastly, as the Ninth Circuit stated, "if both pathways required lawful permanent

[14] These examples include various statutes where the two terms are listed as separate requirements, including INA provisions "that were contemporaneous with § 1432(a) and have since been repealed." *See Cheneau*, 997 F.3d at 921 (citing 8 U.S.C. §§ 1438; 1433(a)(5)(A); 1431(a)(2)).

[15] Defendants argue that, prior to 1952, the phrase "reside permanently" was "understood at the time . . . to require lawful admission for permanent residence." Docket No. 19 at 11 (citations omitted). Even if this is true, it does not explain why Congress would understand the phrase reside permanently to require lawful admission for permanent residence in 1952, after the creation of lawful permanent residency as a formal legal status. This is especially true considering that § 1432(a) includes both phrases, indicating that they have different meanings.

residency, it is difficult to imagine why Congress would write two provisions that use different words but mean the same thing, when it could have written one provision along the lines of pursuant to a lawful admission for permanent residence at the time of naturalization or thereafter." *Id.* at 923 (internal quotations and citation omitted).

Defendants argue that the interpretation of § 1432(a) adopted by the Second and Ninth Circuits would render the first clause surplusage, citing *Matter of Nwozuzu* for support. Docket No. 19 at 8. When overturning *Matter of Nwozuzu*, the Second Circuit addressed the surplusage argument, stating that its interpretation of § 1432(a)

> provides meaning to both of its clauses without rendering either superfluous. The first clause addresses the class of minors who were "lawfully admitted for permanent residence" at the time the second parent was naturalized; they automatically derived citizenship upon the parent's naturalization. By contrast, the second clause addresses minors who, at the time the second parent was naturalized, either lived abroad or lived in the United States but had not been "lawfully admitted for permanent residence." These minors did not derive citizenship automatically upon the parent's naturalization; rather, they derived citizenship automatically, but only after they resided in the United States *and* garnered some "official objective manifestation" of their intent to reside permanently. *See* [*Ashton*, 726 F.3d] at 99 (rejecting notion that subjective intent alone satisfies section 321(a)(5), but suggesting that applying for permanent resident status would meet the requirement).

*Nwozuzu*, 726 F.3d at 329. The Court agrees that the first clause is not rendered superfluous if the second clause is interpreted as not requiring lawful permanent residence. Rather, each clause addresses a different class of minors, both of which are eligible for derivative citizenship under § 1432(a)(5).

Defendants also assert that their interpretation of § 1432(a) is supported by its successor statute, the Child Citizenship Act of 2000 ("CCA"). Docket No. 19 at 11. The CCA eliminates the "reside permanently" pathway to citizenship and requires lawful admission for permanent residence. *Cheneau*, 997 F.3d at 923. According to

defendants, the purpose of the CCA was "to make it easier for foreign-born children of United States citizens to obtain citizenship." Docket No. 19 at 11 (quoting *Pina v. Mukasey*, 542 F.3d 5, 8 (1st Cir. 2008)). Defendants argue that, under plaintiff's interpretation of § 1432(a), the CCA made it harder to obtain derivative citizenship, in contravention of its purpose. *Id.* But courts should "not presume that a law performs only one 'function' or 'role,' but recognize that almost every piece of legislation seeks to serve many competing purposes." *Pulsifer v. United States*, 601 U.S. 124, 179 (2024) (Gorsuch, J, dissenting). And at least one court has found that "Congress's decision to eliminate the 'reside permanently' pathway and narrow the availability of derivative citizenship in 2000 indicates that the previous version of the statute was broader." *Cheneau*, 997 F.3d at 923. Thus, the Court does not find that the CCA indicates that § 1432(a) requires lawful permanent residency.

Interpreting the second clause of § 1432(a) to not require lawful permanent residency raises the question of what is required to show that a minor has begun to reside permanently in the United States. Courts have found that a minor's subjective intent to remain in the United States is insufficient. *Ashton*, 431 F.3d at 99. Rather, as alluded to above, to satisfy the second clause of § 1432(a), there must be "some objective official manifestation of the child's permanent residence."[16] *Nwozuzu*, 726

[16] Defendants argue that this interpretation presents "an administrability problem" because it is unclear what constitutes an official objective manifestation. Docket No. 19 at 11-13. Defendants are correct that there can be complexity in determining what constitutes an official objective manifestation. Nevertheless, statutes often include requirements that necessitate fact-dependent analysis. The Court does not find that § 1432 should be interpreted as always requiring lawful permanent residency just because it would be easier to administer, particularly when the plain language of the statute does not support such an interpretation.

F.3d at 333 (quoting *Ashton*, 431 F.3d at 98-99); *see also Cheneau*, 997 F.3d at 925. "Such a measure ensures that an applicant is genuinely complying with the 'reside permanently' requirement." *Cheneau*, 997 F.3d at 925. The Court agrees with this analysis and adopts the Second and Ninth Circuit's interpretation that there must be an objective official manifestation of a minor's permanent residence in order to satisfy the second prong of § 1432(a).

**C. <u>Objective Official Manifestation</u>**

In *Cheneau*, 997 F.3d at 925, and *Nwozuzu*, 726 F.3d at 334, the courts found that filing an application for adjustment of status to lawful permanent residence is an objective official manifestation of intent to reside permanently in the United States. Defendants state that this is the only circumstance where there was found to be an objective official manifestation and that, absent this narrow circumstance, a plaintiff cannot show an objective official manifestation of intent to reside permanently in the United States. Docket No. 27 at 8. Defendants argue that, in this case, that act must have occurred after plaintiffs' parents' naturalization in 1996 and before the CCA went into effect on February 27, 2001. Docket No. 19 at 13.

Plaintiffs did not file an application for adjustment of status to lawful permanent resident, nor did they take any other official immigration action which would indicate a desire to remain in the United States. But it would be illogical for them to have done so; between the time plaintiffs' parents naturalized and the time plaintiffs turned 18, plaintiffs reasonably believed they were United States nationals. Neither *Nwozuzu* nor *Cheneau* stated that filing an application for adjustment to lawful permanent resident is the only manner to objectively manifest an intent to reside permanently in the United States. To the contrary, the court in *Nwozuzu*, 726 F.3d at 328, stated that, "apart from

actually being lawfully admitted for permanent residency, 'some lesser official objective manifestation' of beginning to reside permanently" would suffice. (citing *Ashton*, 431 F.3d at 99).

The objective official manifestation requirement exists due to the finding that "a child's bare subjective intent to stay in the United States is insufficient to establish that [she] resides here permanently." *Ashton*, 431 F.3d at 98. Instead, there needs to be some objective manifestation which demonstrates an intent to reside permanently in the United States. *Id.* Here, plaintiffs had United States passports. Docket No. 1-2 at 45-46. Plaintiffs have continuously resided in Colorado since 1991, when they were one and three years old. Docket No. 1 at 3, 6, ¶¶ 12, 25. When Mr. Salamo naturalized in 1996, plaintiffs were five and seven years old. *Id.* at 6, ¶ 27. Plaintiffs argue that their passports, attached school records, and their family circumstances, including Mr. Salamo's military service, constitute official objective manifestations of their intent to reside permanently in the United States. Docket No. 25 at 6-7. Notably, a minor's family circumstances, including the presence and naturalization of the minor's parents, can support a finding that there was an objective intent to reside permanently in the United States. *Nwozuzu*, 726 F.3d at 334.

Plaintiffs state that they moved to Colorado Springs in 1991. Docket No. 1 at 6, ¶ 25. Mr. Salamo's discharge papers indicate that he and his wife were still living in Colorado Springs in 2006. Docket No. 1-2 at 32. Thus, during the relevant dates between 1996 and 2001, plaintiffs were young children residing with their naturalized United States citizen parents in Colorado Springs. Like in *Nwozuzu*, the presence and naturalization of plaintiffs' parents support a finding that they had an objective intent to

reside permanently in the United States. Moreover, before, during, and after the relevant time-period, plaintiffs had United States passports. *Id.* at 45-46. While an individual could have a United States passport and not reside in the United States, this nevertheless constitutes an official objective manifestation of plaintiffs' connection to the United States and belief that they were United States nationals. Plaintiffs also submitted school records showing that Ashley Salamo attended elementary school in Colorado Springs between 1996 and 2000. *Id.* at 57. School records further indicate that plaintiffs attended middle school, high school, and college in Colorado. *Id.* at 48-60. While this schooling occurred after 2001, "subsequent events can shed light on how reliably [an objective metric] demonstrates an individual's intent." *Sharma v. Garland*, 67 F.4th 1, 4 (1st Cir. 2023) (citation omitted). Viewing all these facts in aggregate, the Court finds that plaintiffs have plausibly alleged an objective manifestation of their intent to reside permanently in the United States.[17] Therefore, the Court will deny defendants' motion to dismiss.[18]

As noted above, defendants argue that if the complaint is construed as bringing a claim under the APA, the Court lacks jurisdiction over such a claim. Docket No. 19 at

[17] Defendants argue that plaintiffs cannot satisfy § 1432(a) because they were not lawfully present in the United States, Docket No. 19 at 14, noting that plaintiffs entered the United States with fraudulently obtained passports. Docket No. 27 at 9. As defendants acknowledge, this fraud was "not of their own making." Docket No. 19 at 1-2. More importantly, "[t]he word 'lawful' is conspicuously absent from the second pathway," and the Court refuses to "impose a substantive requirement that Congress clearly did not include." *Cheneau*, 997 F.3d at 925.

[18] In their response to the motion to dismiss, plaintiffs request that the Court grant them relief and declare that they are United States citizens. Docket No. 25 at 15. Pursuant to the Local Rules for the District of Colorado, "[a] motion shall not be included in a response or reply to the original motion. A motion shall be filed as a separate document." D.C.COLO.LCivR 7.1(d). Therefore, plaintiffs must request relief in a separate motion.

14-15. However, plaintiffs' complaint does not bring an APA claim in its "Statement of Claims," and plaintiffs do not assert that they bring such a claim in their response to the motion to dismiss. Thus, the Court finds that plaintiffs did not bring an APA claim and will not further analyze this issue.

## IV. CONCLUSION

Therefore, it is

**ORDERED** that the Motion to Dismiss [Docket No. 19] is **DENIED**.

DATED August 31, 2026.

BY THE COURT:

PHILIP A. BRIMMER
United States District Judge